**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE EXTRADITION OF BRUCE AINSLEY BERESFORD-REDMAN | ) ) ) ) ) ) ) ) | NO. CR 10-2780M **ORDER DENYING MOTION TO RELEASE** **BRUCE BERESFORD-REDMAN** **(Docket No. 13)** |

**I.**

**INTRODUCTION**

On November 12, 2010, the United States of America ("the United States") filed a Complaint for Provisional Arrest with a View Towards Extradition (the "Complaint") pursuant to 18 U.S.C. § 3184. The Complaint alleged that Bruce Ainsley Beresford-Redman ("Beresford-Redman") had been charged in the State of Quintana Roo, Mexico with aggravated homicide as described by articles 86, 106(I) and 14, and punishable under article 89 of the Penal Code of the State of Quintana Roo. (Complaint at 2, ¶ 5). The Complaint further alleged that aggravated homicide is an extraditable offense under Article 2, Paragraph 1 of the Extradition Treaty between the United States and

Mexico (the "Extradition Treaty"), and Item 1 of its Appendix. (Id. at 10, ¶ 7). Finally, the Complaint alleged that Beresford-Redman was at large in the Central District of California and requested a warrant for Beresford-Redman's arrest. (Id., ¶ 9). Also on November 12, 2010, the Court issued a warrant for the provisional arrest of Beresford-Redman.

On November 16, 2010, Beresford-Redman was arrested and taken into custody. On November 17, 2010, the United States filed a Motion for Detention of Fugitive Bruce Ainsley Beresford-Redman Pending Extradition (the "Motion for Detention"). In the Motion for Detention, the United States asked the Court to order Beresford-Redman held without bond pending receipt of the formal request for extradition and the hearing on the certification of the extradition. (Motion for Detention at 1-2). After briefing by the parties, the Court held a hearing on the Motion for Detention on November 29, 2010. The Court granted the Motion for Detention at the hearing and issued a decision on December 2, 2010.

Also on November 29, 2010, Beresford-Redman filed a Motion to Release Bruce Beresford-Redman for Provisional Arrest in Violation of the Fourth Amendment (the "Motion to Release"). Later the same day, the United States filed an Opposition to Motion for Release Based on Alleged Violation of Fourth Amendment (the "Opposition"). On December 1, 2010, the United States filed a Supplemental Opposition to Motion for Release Based on Alleged Violation of Fourth Amendment (the "Supplemental Opposition"). On December 3, 2010, Beresford-Redman filed a Reply to Government's Supplemental Opposition to Motion for Release for Fourth Amendment Violation (the "Reply"). On December 7, 2010, the Court held

a hearing on the Motion to Release.  For the reasons discussed below, the Court DENIES the Beresford-Redman's Motion to Release (Docket No. 13).

## II.

### BERESFORD-REDMAN'S ARGUMENTS

Beresford-Redman contends that he should be released forthwith because the provisional arrest warrant was not supported by competent evidence nor did the government make a showing of probable cause. (See Motion to Release at 3).  First, Beresford-Redman argues that the Fourth Amendment requires probable cause to support a warrant for provisional arrest.  (See Reply at 2-4).  Second, Beresford-Redman argues that Article 11 of the Extradition Treaty and 18 U.S.C. § 3184 violate the Fourth Amendment because they authorize a warrant for provisional arrest without probable cause.[1]  (See id. at 4-9).  Third, Beresford-Redman argues that the facts in the Complaint fail to establish probable cause because they are asserted on "information and belief." (See id. at 9-13).

---

[1]  At the hearing, the United States objected to Beresford-Redman's constitutional challenge to Article 11 of the Extradition Treaty and 18 U.S.C. § 3184 because he raised this argument for the first time in his Reply.  See, e.g., United States v. Anderson, 472 F.3d 662, 668 (9th Cir. 2006) ("Issues raised for the first time in an appellant's reply brief are generally deemed waived."); Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").  As the Court has concluded it need not reach the constitutional issues, it is unnecessary to resolve this objection.

Beresford-Redman primarily bases his arguments on the Ninth Circuit's opinion in Parretti v. United States, 122 F.3d 758, 764 (9th Cir. 1997), withrdawn and appeal dismissed on other grounds 143 F.3d 508 (9th Cir. 1998).  (See, e.g., Motion to Release at 3) ("This case falls squarely within the holding of Parretti.").  In Parretti, the Ninth Circuit determined that 18 U.S.C. § 3184 authorized the issuance of provisional arrest warrants pursuant to extradition treaties without a showing of probable cause.  See Parretti, 122 F.3d at 770 ("Section 3184 does not require an independent judicial determination of probable cause to believe the fugitive committed the offense. . . .  In other words, § 3184 contemplates an arrest so that thereafter, at the extradition hearing, the 'evidence of criminality,' i.e., the existence of probable cause, may be heard.").  Based on this construction of the statute, the Ninth Circuit found that section 3184 violated the Fourth Amendment.  See id. at 773 ("18 U.S.C. § 3184 violates the Fourth Amendment to the extent it authorizes the issuance of 'provisional arrest' warrants without independent judicial determinations of probable cause.  We reject the government's argument that a warrant for 'provisional arrest' made pursuant to treaty may be constitutionally issued on the existence of a foreign arrest warrant charging the fugitive with having committed extraditable crimes, unsupported by competent evidence of probable cause.").

The panel in Parretti went on to find that the evidence offered in support of the provisional arrest warrant at issue was insufficient to permit the magistrate judge to make a finding of probable cause because the evidence "consisted of nothing more than naked allegations."

4

Parretti, 122 F.3d at 775 ("[T]hose allegations without supporting affidavits or other competent evidence provide no basis for a judicial determination whether there is probable cause to believe Parretti committed an extraditable crime."). The Ninth Circuit explained that "the facts alleged in the French arrest warrant were obtained from 'investigations' by unidentified French authorities and from unidentified experts, shareholders, and employees of [the allegedly victimized company]. The government presented no affidavits, deposition testimony, or other competent evidence that could have provided [the magistrate judge] with a substantial basis for concluding that probable cause exists." Id. at 774 (citation, internal quotation marks, and ellipses omitted)).

Beresford-Redman concedes that Parretti is not binding precedent because it was withdrawn on other grounds, but argues that the Court should consider and adopt the opinion's Fourth Amendment analysis. (See Reply at 3 n.1) ("The Fourth Amendment ruling by the Parretti panel is not controlling precedent because the opinion was withdrawn under the doctrine of 'fugitive disentitlement' following Parretti's flight from the jurisdiction of the United States. Given that the decision was withdrawn on other grounds, this Court may, and should, consider the panel's reasoned decision on the Fourth Amendment issues in the context of a provisional arrest pursuant to treaty.").

\\
\\
\\
\\
\\

III.

DISCUSSION

**A.    The Court Need Not Resolve Beresford-Redman's Constitutional Claims Because The Provisional Arrest Complaint Is Amply Supported By Probable Cause**

Few courts have resolved the difficult question of whether Article 11 of the Extradition Treaty or 18 U.S.C. § 3184 require a showing of probable cause to support the issuance of a provisional arrest warrant. See, e.g., Parretti, 122 F.3d at 768 ("[W]e know of no case in which this question has been decided . . . ."). The Second Circuit has held that a provisional arrest warrant must be supported by probable cause, but recognized that the showing may be met with less formal evidence than at an extradition hearing. See Caltagirone v. Grant, 629 F.2d 739, 747 (2nd Cir. 1980) (recognizing that probable cause to support a provisional arrest warrant requires "no formalities" and that the evidence required at an extradition hearing "necessarily implies a greater degree of formality"). The Eighth Circuit stated in dicta that section 3184 requires a showing of probable cause, but failed to provide any explanation or analysis. See United States v. Wiebe, 733 F.2d 549, 553-54 (8th Cir. 1984) ("A magistrate may issue a provisional arrest warrant upon a showing in a sworn complaint of a treaty of extradition between the United States and any foreign country, and that the person sought committed in the foreign jurisdiction one of the crimes set forth in the treaty.").

1    The Fifth Circuit has assumed without deciding that a provisional
2  arrest warrant must be supported by probable cause. See In re
3  Extradition of Russell, 805 F.2d 1215, 1217 (5th Cir. 1986) ("Assuming
4  without deciding that the Treaty requires a showing of probable cause to
5  support a provisional arrest before an extradition hearing, we agree
6  with the district court that the magistrate had enough evidence before
7  him to show probable cause to detain Russell."). The Seventh Circuit
8  similarly avoided resolving this question because the provisional arrest
9  warrant at issue was supported by probable cause. See Sahagian v.
10 United States, 864 F.2d 509, 513 n.4 (7th Cir. 1988) ("There is some
11 tension among the cases over whether a foreign country must show full
12 probable cause for arrest before a person may be arrested and detained
13 by the United States pursuant to an application for provisional arrest.
14 . . . Because there was a showing of probable cause to support
15 Sahagian's arrest and detention, we need not venture into this debate or
16 decide whether the debate even has any applicability when the United
17 States seeks the provisional arrest and detention of a person.").

18

19   This Court concludes that it need not resolve whether Article 11 of
20 the Extradition Treaty or section 3184 requires probable cause because
21 the provisional arrest warrant in this case is amply supported by
22 probable cause. See In re Extradition of Russell, 805 F.2d at 1217;
23 Sahagian, 864 F.2d at 513 n.4; see also Spatola v. United States, 741 F.
24 Supp. 362, 366 (E.D.N.Y. 1990) ("As to the provisional arrest warrant
25 the Magistrate noted that there is a question among the federal courts
26 as to whether a provisional arrest for extradition has to be upon
27 probable cause as normally required by the Constitution for arrests for
28
                                      7

violation of the criminal laws of this country.   Nevertheless, the Magistrate proceeded to find that the Complaint and Affidavit of Assistant United States Attorney Eric Friedberg established probable cause, holding that the information supplied therein, taken as true, even if hearsay, would justify a reasonable belief that Spatola committed the crime of bribery in Italy." (citations omitted)).   Indeed, this Court has an obligation to avoid construing a statute in a way that raises difficult constitutional issues.   See, e.g., Zadvydas v. Davis, 533 U.S. 678, 689, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) ("It is a cardinal principle of statutory interpretation, however, that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (internal quotation marks omitted)); accord United States v. Hernandez, 322 F.3d 592, 594 (9th Cir., as amended March 5, 2003).   Even in Parretti, the Ninth Circuit attempted to avoid reaching the constitutional issue.   See Parretti, 122 F.3d at 770 ("In sum, neither the treaty with France nor § 3184 can fairly be construed as requiring a traditional showing of probable cause for the issuance of a warrant for provisional arrest. Nor can we avoid the Fourth Amendment question presented by Parretti's appeal by finding that a showing of probable cause has in fact been made.").

\\
\\
\\
\\
\\
\\

**B.   The Provisional Arrest Complaint Is Amply Supported By Probable Cause**

The Complaint contains considerable evidence establishing probable cause[2] that Beresford-Redman committed the offense of aggravated homicide against Monica Burgos Beresford-Redman ("Monica Burgos").   Indeed, Beresford-Redman's counsel conceded at the hearing that probable cause would be satisfied if the facts in the Complaint were accepted as true.

Under Mexican law, aggravated homicide is defined as an intentional deprivation of life where one of four elements is met:   (1) premeditation;   (2) unfair advantage;   (3) treachery;   or (4) betrayal. See In re Salazar, 2010 WL 2925444, at *13 (S.D. Cal. July 23, 2010); Diaz-Medina v. United States, 2003 WL 21245992, at *2 (N.D. Tex. Feb. 13, 2003).[3]   "Premeditation exists when the perpetrator decides to commit

---

[2]   Probable cause is defined as a degree of certainty more likely than not. See, e.g., Illinois v. Gates, 462 U.S. 213, 235, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ("While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." (internal quotation marks omitted)).   Probable cause is a "flexible, easily applied standard" which considers the "totality-of-the-circumstances." Id. at 238-39; see also id. ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

[3]   The Court notes that In re Salazar involved the crime of aggravated homicide as defined by the law of the State of Baja California and Diaz-Medina involved the crime of aggravated homicide as

a future crime, and chooses the means to do so." <u>Diaz-Medina</u>, 2003 WL 21245992, at *2.  Unfair advantage exists when either: (1) "the offender is obviously more skillful or stronger than the victim or when the victim is unarmed"; (2) "the defendant is stronger due to the weapons he uses, to his greater skill in the handling of these weapons or due to the number of persons who accompany him"; (3) "the defendant by any means, weakens the victim's defenses"; (4) "the victim is defenseless or fallen and the offender is armed or on his feet"; or (5) "the offender is in no danger of being killed or harmed by the victim when the offender is perpetrating the crime." <u>Id.</u>; <u>accord</u> <u>In re Salazar</u>, 2010 WL 2925444, at *12.  "Treachery exists when someone is intentionally surprised, or abused by another." <u>Diaz-Medina</u>, 2003 WL 21245992, at *2. "Betrayal exists when there is breach of the trust or of the protection that had been promised either expressly or tacitly to the victim due to kinship, gratitude, friendship, employment relationship or any other circumstance that may inspire trust." <u>Id.</u>

Here, the facts alleged in the Complaint are more than sufficient to establish probable cause to believe that Beresford-Redman intentionally deprived Monica Burgos of her life with either premeditation, unfair advantage, treachery, or betrayal.  In sworn statements to both United States and Mexican law enforcement authorities, Monica Burgos' sister, Jeane Ferreira Burgos ("Ferreira Burgos"), stated that Monica Burgos and Beresford-Redman were having marital problems because Beresford-Redman was having an affair.

defined by the law of the State of Jalisco. <u>See</u> <u>In re Salazar</u>, 2010 WL 2925444, at *1; <u>Diaz-Medina</u>, 2003 WL 21245992, at *1.

1  (Complaint at 2-3, ¶¶ 6(b)-(c)).  The fact of Beresford-Redman's affair
2  was confirmed through emails obtained by Mexican authorities.  (Id. at
3  3, ¶ 6(d)).  Hostilities between the couple, including Monica Burgos'
4  request for a divorce, were evident shortly before the trip.  (Complaint
5  at 2-3, ¶¶ 6(b)-(c).  Beresford-Redmond proposed the family trip and
6  paid for the travel.  (Id. at 6(e)).  In an interview with United States
7  law enforcement authorities, the nanny for Monica Burgos's children,
8  Maria Beatriz Oaxaca ("Oaxaca"), stated that Beresford-Redman and Monica
9  Burgos had a "big fight" concerning Beresford-Redman's affair the night
10 before they departed for Cancun.  (Id. at 4, ¶ 6(f)).

12     In a sworn statement to Mexican authorities, an employee at the
13 hotel in Cancun, Erick Uriel Gonzalez Reyes ("Gonzalez Reyes"), stated
14 that he observed Beresford-Redman and Monica Burgos arguing at
15 approximately 8:30 p.m. on April 4, 2010.  (Complaint at 4-5, ¶ 6(i)).
16 Gonzalez Reyes described Monica Burgos as crying and said that
17 Beresford-Redman twice attempted to physically assault her, but stopped
18 because Beresford-Redman realized that Gonzalez Reyes was watching.
19 (Id.).

21     In a handwritten statement provided to hotel security officers, two
22 teenagers were awakened by screams, cries for help, and extremely loud
23 banging from the room directly above theirs at approximately 6:00 a.m.
24 on the morning of April 5, 2010.  (Complaint at 5, ¶ 6(j)).  The
25 teenagers described the noises as continuing for fifteen minutes and
26 sounding like a woman in distress.  (Id.).  In a sworn statement to
27 Mexican authorities, a hotel concierge, Angelica Arroyo Ramirez ("Arroyo
28 Ramirez"), stated that Beresford-Redman, Monica Burgos, and their

children were staying in the room directly above the teenagers. (Id. at 5, ¶ 6(k)). Arroyo Ramirez stated that she telephoned Beresford-Redman's hotel room on the morning of April 5, 2010 to make sure that everyone was all right. (Id. at 5, ¶ 6(l)). Beresford-Redman answered the phone and admitted that the noises had come from his room, but claimed that they were related to a fight he was having with Monica Burgos regarding the behavior of their children. (Id.). However, in a subsequent statement to Mexican authorities after Monica Burgos disappeared, Beresford-Redman denied telling Arroyo Ramirez that the noise was caused by an argument with his wife and instead claimed that the noise was caused by a game with his son. (Id. at 6, ¶ 6(m)).

In a sworn statement to Mexican authorities, a cleaning employee of the hotel, Carlos Mario Vazquez Olan ("Vasquez Olan"), stated that he cleaned Beresford-Redman's room on April 3, 2010 and did not notice anything out of the ordinary. (Complaint at 6, ¶ 6(n)). On April 5, 2010, Vasquez Olan arrived to clean Beresford-Redman's room, but did not enter because he noticed a "Do Not Disturb" sign on the door. (Id.).

In a sworn statement to Mexican authorities, Beresford-Redman stated that he last saw Monica Burgos at approximately 8:30 or 9:00 a.m. on April 5, 2010 in their hotel room. (Complaint at 6, ¶ 6(o)). Beresford-Redman said that Monica Burgos left to go shopping for the day, but did not take her cell phone, and that he did not expect her to return until approximately 10:00 p.m. that night. (Id. at 6-7, ¶ 6(o)). In an interview with United States law enforcement, Ferreira Burgos stated that Monica Burgos never traveled anywhere without her cell phone

and certainly would not have left her cell phone at the hotel if she had gone shopping without her children.  (Id.).

In his sworn statement, Beresford-Redman said that by approximately 10:00 p.m. on April 5, 2010, Monica Burgos had not returned to their room and he went to sleep. (Complaint at 7, ¶ 6(p)).  Beresford-Redman stated that he woke up at approximately 11:00 p.m. the same evening and that he became worried because Monica Burgos had still not returned. (Id.).  Beresford-Redman stated that he went in and out of his room several times and walked around the hotel looking for Monica Burgos, but never spoke to anyone at the hotel or reported his wife missing that night.  (Id.).  Beresford-Redman stated that he eventually returned to his room and fell asleep.  (Id.).  However, in her sworn statement to Mexican authorities, Ferreira Burgos said that she spoke with Beresford-Redman by telephone on April 6, 2010, at which time Beresford-Redman said that he had fallen asleep on the night of April 5, 2010 and did not notice Monica Burgos' absence until he woke up on the morning of April 6, 2010.  (Id.).

In a sworn statement to Mexican authorities, a hotel security guard, Rodolfo Mogo Almeida ("Mogo Almeida"), stated that the hotel keeps very detailed records of persons entering and exiting the hotel property, including checking names against a list of hotel guests, and that every hotel guest leaving the property is identified. (Complaint at 8, ¶ 6(r)).  Mogo Almeida stated that his shift is from 8:00 a.m. to 5:00 p.m. Monday through Saturday and that he had not seen Monica Burgos leave the hotel property.  (Id.).

13

On April 8, 2010, at approximately 9:20 a.m., a hotel employee found Monica Burgos' body in a sewage tank on hotel grounds. (Complaint at 8, ¶ 6(s)).  The sewage tank was located approximately 25 meters from the building where Beresford-Redman's hotel room was located.  (Id.). An autopsy revealed that Monica Burgos had bruising to her face, a blunt head wound, and died as a result of asphyxia by suffocation. (Id. at 8, ¶ 6(t)).

On April 9, 2010, a forensic expert examined Beresford-Redman's hotel room.  (Complaint at 8, ¶ 6(u)).  The forensic expert found stains on a pillar in the room, on the sheets on the bed, and on a railing on the balcony which tested presumptively positive for the presence of blood.  (Id.).

Beresford-Redman's hotel room has a view of the sewage tank in which Monica Burgos' body was found. (Complaint at 9, ¶ 6(v)).  There was a footprint and damaged plants leading to the sewage tank, indicating that the body may have been moved from another location. (Id.).  The hotel room is opened by an electronic card key. (Id. at 9, ¶ 6(w)).  Hotel records indicate that one of the keys issued to Beresford-Redman and his family was used to open the hotel room door at least nine times between midnight and 7:00 a.m. on the morning of April 6, 2010.  (Id.).  At least four of these entries are recorded as occurring during a fifteen-minute period between 4:00 a.m. and 4:15 a.m. (Id.).

During an April 7, 2010 interview of Beresford-Redman conducted by Mexican authorities, law enforcement officers observed scratches or

14

abrasions on both of Beresford-Redman's hands, behind his ear, on his left shin, and on his right ankle.   (Complaint at 9, ¶ 6(y)). Beresford-Redman said the scratches on his hands and legs came from a climbing excursion and that the scratches behind his ear were caused by a swimming incident.   (<u>Id.</u>).

     Having considered all the facts alleged in the Complaint, the Court concludes that there is probable cause to believe Beresford-Redman intentionally deprived Monica Burgos of her life with either premeditation, unfair advantage, treachery, or betrayal.

**C.   <u>The Court's Finding Of Probable Cause May Be Based Entirely On Hearsay Or Less Formal Evidence</u>**

     Beresford-Redman argues that the evidence contained in the Complaint is insufficient to establish probable cause "because the only source of information it identifies for the allegations is the warrant of arrest issued by a judicial officer in Mexico, a diplomatic note, and 'supplemental information.'"   (Reply at 9).   According to Beresford-Redman, "there can be no determination of probable cause in this case because the judicial officer cannot assess the reliability of the information and there is no corroboration presented to establish reliability."   (<u>Id.</u>).

     Contrary to Beresford-Redman's arguments, however, it is well established that courts may rely on hearsay evidence in extradition proceedings.   <u>See, e.g.</u>, <u>Then v. Melendez</u>, 92 F.3d 851, 855 (9th Cir. 1996) ("Because hearsay evidence is admissible to support a probable

15

1   cause determination in an extradition hearing and the usual rules of

2   evidence are not applicable to this context, the affidavits are

3   competent evidence to sustain the magistrate's probable cause finding."

4   (citations omitted)); <u>Emami v. United States Dist. Court for Northern</u>

5   <u>Dist.</u>, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has

6   been repeatedly held that hearsay evidence that would be inadmissible

7   for other purposes is admissible in extradition proceedings.").  It is

8   equally clear that the evidence need not be provided under oath and that

9   it may contain multiple levels of hearsay.  <u>See, e.g.</u>, <u>Manta v.</u>

10  <u>Chertoff</u>, 518 F.3d 1134, 1147 (9th Cir. 2008) ("Manta cites no cases to

11  support that the Fourth Amendment requires that every piece of evidence

12  relied on in an extradition proceeding be sworn.  Moreover, such a

13  requirement would run contrary to our well-established case law that

14  evidence offered for extradition purposes need not be made under

15  oath."); <u>Zanazanian v. United States</u>, 729 F.2d 624, 627 (9th Cir. 1984)

16  ("We next consider Zanazanian's contention that multiple hearsay does

17  not constitute competent evidence.  He argues in substance that while a

18  verbatim report of the witness's actual statement may be competent, a

19  police officer's report describing a witness's statement is quite a

20  different matter.  These reports, he submits, are particularly

21  unreliable because they are, as appellant describes them, 'only

22  summaries and bits of conversations as recollected by the interrogating

23  police officers.'  While we acknowledge that the extra hearsay step

24  might in certain cases result in decreased reliability, we believe that

25  the reports in this case are sufficiently reliable to be deemed

26  competent.").

27

28

16

1    At the hearing, Beresford-Redman's counsel argued that the evidence

2    contained in the Complaint does not qualify as "competent evidence"

3    because it is based only on "information and belief."   However, the

4    Supreme Court has repeatedly rejected this argument.   See Fernandez v.

5    Philips, 268 U.S. 311, 312-13, 45 S. Ct. 541, 69 L. Ed. 970 (1925)

6    (holding that affidavit filed by an attorney for the United States on

7    information and belief was sufficient to establish probable cause);

8    Glucksman v. Henkel, 221 U.S. 508, 514, 31 S. Ct. 704, 55 L. Ed. 830

9    (1911) ("The complaint is sworn to upon information and belief, but it

10   is supported by the testimony of witnesses who are stated to have been

11   deposed, and whom, therefore, we must presume to have been sworn.   That

12   is enough."); Yordi v. Nolte, 215 U.S. 227, 231, 30 S. Ct. 90, 54 L. Ed.

13   170 (1909) ("We do not wish, however, to be understood as holding that,

14   in extradition proceedings, the complaint must be sworn to by persons

15   having actual knowledge of the offense charged.   This would defeat the

16   whole object of the treaty, as we are bound to assume that no foreign

17   government possesses greater power than our own to order its citizens to

18   go to another country to institute legal proceedings.   This is obviously

19   impossible." (internal quotation marks omitted)); see also In re

20   Extradition of Russell, 805 F.2d 1215, 1217 (5th Cir. 1986) ("Even

21   Caltagirone, which questioned the constitutional propriety of a

22   provisional arrest without probable cause, recognized that the evidence

23   at the provisional arrest stage could be informal.   In addition, several

24   cases have approved the use of a complaint based on information and

25   belief rather than personal knowledge." (citation omitted)).

26

27   As noted in Parretti, the primary authority on which Beresford-

28   Redman relies, the Supreme Court in Yordi permitted evidence to be

17

submitted on information and belief. See Parretti, 122 F.3d at 775 ("It is true, as the government says, that the Yordi Court rejected the argument that an extradition complaint must be sworn to by persons having personal knowledge of the facts alleged."). In Parretti, the Ninth Circuit ultimately concluded that the evidence submitted in support of the provisional arrest warrant was insufficient, not specifically because the evidence was submitted on information and belief, but rather because the evidence "consisted of nothing more than naked allegations." Id. As explained by the Ninth Circuit, the affidavit submitted in support of the provisional arrest warrant merely alleged factual conclusions set out in a French arrest warrant without any specifics about how those facts were obtained. See id. at 774 ("In applying for the warrant to arrest Parretti, all the government presented were the French Magistrate's allegations of fact. According to the information and belief allegations of the [Assistant United States Attorney's] Complaint, the facts alleged in the French arrest warrant were obtained from 'investigations' by unidentified French authorities and from unidentified experts, shareholders, and employees of [the allegedly victimized company].").

Here, in stark contrast to the Paretti situation, the Complaint is replete with specifics about how the facts were obtained. See generally supra Part IV.B. For example, the Complaint specifically attributes facts to sworn statements from Ferreira Burgos, (Complaint at 2-3, ¶¶ 6(b), (e)), Gonzalez Reyes, (id. at 4-5, ¶ 6(i)), Arroyo Ramirez, (id. at 5-6, ¶¶ 6(k)-(l)), Vasquez Olan, (id. at 6, ¶ 6(n)), Mogo Almeida (id. at 8, ¶ 6(r)), and Beresford-Redman himself. (Id. at 6-7, ¶ 6(o), 6(p), 6(q)). The Complaint further attributes specific facts to emails

obtained by Mexican authorities, (id. at 3, ¶ 6(d)), an interview of Oaxaca by United States law enforcement, (id. at 4, ¶ 6(f)), a handwritten statement provided to hotel security officers, (id. at 5, ¶ 6(j)), an interview of Ferreira Burgos by United States law enforcement, (id. at 3, 7, ¶¶ 6(c), (o)), an autopsy report, (id. at 8, ¶ 6(t)), a forensic expert, (id. at 8, ¶ 6(u)), hotel records, (id. at 9, ¶ 6(w)), and an interview of Beresford-Redman by Mexican authorities. (Id. at 6, 9, ¶¶ 6(m), (y)).

In sum, the Court concludes because the Supreme Court has expressly approved of allegations set forth on information and belief and because the Complaint here provides far more factual detail than the conclusory allegations which troubled the Ninth Circuit in Parretti, the Motion To Release must be denied. See, e.g., Manta v. Chertoff, 2007 WL 951298, at *5 (S.D. Cal. Mar. 9, 2007) ("In short, [the magistrate judge] properly rejected Parretti as controlling, not only because the Ninth Circuit withdrew the opinion, but also because the government has provided much more than a bare complaint alleging the existence of a foreign arrest warrant for extraditable offenses."); In re Extradition of Orellana, 2000 WL 1036074, at *7 (S.D.N.Y. July 26, 2000) ("[U]nlike the situation in Parretti, the judicial officer who issued Orellana's provisional arrest warrant knew the type of evidence that informed the issuance of the Mexican warrant and knew the source of the information upon which the Mexican warrant was issued; although he did not review affidavits or deposition testimony before issuing the warrant.").

Finally, Beresford-Redman argues that the facts in the Complaint are insufficient to establish probable cause because Article 10 of the

Extradition Treaty requires certified documents.  (See Reply at 9 n.6)
("At a minimum, Article 10 requires that documents accompanying a
request for extradition be 'certified by the principle diplomatic or
consular officer of the United States of Mexico.'  No such certified
documents have been presented here.").  However, Article 10 only applies
to the request for extradition.  See Extradition Treaty, U.S.-Mex., May
4, 1978, 2980, 31 U.S.T. 5059, T.I.A.S. No. 9656, art. X(6) ("The
documents which, according to this Article, shall accompany the request
for extradition, shall be received in evidence . . . .").  By contrast,
Article 11 governs provisional arrest and does not require certified
documents.  See id., art. XI(1) ("In the case of urgency, either
Contracting Party may request, through the diplomatic channel, the
provisional arrest of an accused or convicted person.  The application
shall contain a description of the offense for which the extradition is
requested, a description of the person sought and his whereabouts, an
undertaking to formalize the request for extradition, and a declaration
of the existence of a warrant of arrest issued by a competent judicial
authority or a judgment of conviction issued against the person
sought.").

Indeed, the Ninth Circuit adopted this interpretation of two
articles in the Extradition Treaty between the United States and
Argentina which are nearly identical to Article 10 and Article 11 of the
Extradition Treaty between the United States and Mexico.  See In re
Extradition of Kraiselburd, 786 F.2d 1395, 1396-97 (9th Cir. 1986)
("Under the Treaty, the extradition request must include an arrest
warrant.  In case of urgency, the Treaty permits the requesting country

to seek the fugitive's provisional arrest.  A request for provisional arrest need only be accompanied by a declaration that an arrest warrant exists; it need not actually include a warrant." (citation omitted)); see also Yordi, 215 U.S. at 230 ("[I]t was not indispensable to the jurisdiction of the commissioner that the record and depositions from Mexico should be actually fastened to the complaint when they were in the custody and keeping of the consul, and the commissioner was already in possession of the information which they contained.").  Accordingly, the United States was not required to provide certified documents in support of the provisional arrest complaint and warrant.

**IV.**

**CONCLUSION**

It is unnecessary for the Court to resolve Beresford-Redman's constitutional claims because the provisional arrest warrant is amply supported by probable cause.  The evidence contained in the Complaint is significant and specifically identifies the factual bases of the allegations.  It is well established that courts may rely on hearsay evidence in extradition proceedings, including multiple levels of hearsay, and that the evidence need not be provided under oath. Moreover, the Supreme Court has expressly approved of evidence

\\
\\
\\
\\
\\
\\

submitted on "information and belief."  Finally, Article 11 of the Extradition Treaty governs provisional arrest and does not require certified documents.

Accordingly, IT IS ORDERED that Beresford-Redman's Motion to Release (Docket No. 13) is DENIED.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order on counsel for the parties.

DATED: December 17, 2010.

                                    /S/
                         _____
                         SUZANNE H. SEGAL
                         UNITED STATES MAGISTRATE JUDGE

22